Wayne LeCROY, District Clerk, et al., Relators,

v.

Ben HANLON, Respondent.

No. C–4745.

Supreme Court of Texas.

July 2, 1986.

Jim Mattox, Atty. Gen., F. Scott McCown, Dwight Martin, Mary F. Keller, Sarah Woelk, Austin, for relator.

Broadus Spivey, Dan F. Junell, Spivey, Grigg, Kelly & Knisely, Austin, for respondent.

SPEARS, Justice.

We are called upon to decide whether sections 31 and 32 of the Omnibus Fee Bill (House Bill 1593, 69th Leg., 1985), which direct $40 of a litigant's district court filing fee to go to state general revenues, violate the Texas Constitution. The 237th District Court of Lubbock County held the act unconstitutional. The Attorney General, on behalf of the State of Texas, appealed directly to this court. Tex.Gov.Code § 22.-001(c) (Vernon's Pamphlet 1986). We affirm the district court's judgment, holding sections 31 and 32 violate the Texas Constitution's caption requirement, Article III, § 35, and open courts provision, Article I, § 13.[1]

### I. *Facts.*

The facts are undisputed. Ben Hanlon's truck was damaged in an automobile accident on March 2, 1985. Texas Wrecker Service towed the truck to its yard. Hanlon had automobile insurance, including towing coverage, on his truck from Northern County Mutual Insurance Company. Northern County Mutual refused to pay Hanlon's claim, and Texas Wrecker Service refused to release Hanlon's truck without payment.

On September 5, 1985, Hanlon attempted to file suit under the Texas Insurance Code and Texas Deceptive Trade Practices Act against Northern County Mutual and Texas Wrecker Service with the Lubbock County District Clerk. He presented the district clerk with two checks totaling $98, the filing fee existing before September 1, 1985. The district clerk refused the petition, because Hanlon did not tender $173, the filing fee effective September 1, 1985 under House Bill 1593 §§ 31, 32.[2] Section 31 increased the district court filing fee from $25 to $75; Section 32 allocated $10 of the increase to the district clerk and the remaining $40 to the state's general revenue fund. Mr. Hanlon did not file an affidavit of inability to pay costs under Tex.R. Civ.P. 145.

Hanlon filed a petition for writ of mandamus and amended it to request a declarato-

---

**1.** All Articles referred to in the text are from the Texas Constitution.

**2.** Sections 31 and 32 read:
SECTION 31. Article 3927, Revised Statutes, is amended to read as follows:
Art. 3927. DISTRICT CLERK. The clerks of the district courts shall receive the following fees for their services:

For each suit filed, including appeals
from inferior courts ................. $75.00

.     .     .     .

SECTION 32. Title 61, Revised Statutes, is amended by adding Article 3928b to read as follows:

Art. 3928b. FILING FEES ALLOCATED TO STATE
Sec. 1. From each fee collected under Article 3927, Revised Statutes, for the filing of suits, including appeals from inferior courts, the district clerk shall retain $35 and send the remainder to the comptroller of public accounts.
Sec. 2. The district clerk shall send the state's share of the fees to the comptroller at least as frequently as monthly and shall account for the retained fees as required by law. The comptroller shall deposit the state's share of the fees in the general revenue fund.
Section 31 is now found in Tex.Gov't Code § 51.317 (Vernon Pamphlet 1986); Section 32 in

ry judgment and injunctive relief against the Lubbock County District Clerk. Hanlon maintained that the fees he tendered were proper and that the new fee requirements were unconstitutional. After a hearing, the district court agreed. The court declared sections 31 and 32 unconstitutional on four state constitutional grounds: the unity of subject requirement in Article III, § 35; the caption requirement in Article III, § 35; the open courts provision of Article I, § 13; and the compensation of local officers and disposition of fees provisions in Article XVI, § 61. The court issued a mandamus directing the district clerk to file Hanlon's petition and enjoining the collection of the new fee. The Attorney General on behalf of the State appeals the declaratory judgment and the injunctive relief.

## II. *Article III, § 35.*

■ Article III, § 35 reads:

No bill, (except general appropriation bills, which may embrace the various subjects and accounts, for and on account of which monies are appropriated) shall contain more than one subject, which shall be expressed in its title. But if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof, as shall not be so expressed.

Article III, § 35 contains two requirements: (1) the unity of subject requirement; and (2) the caption requirement. When determining a statute's constitutionality, this court generally begins with a presumption of validity. Furthermore, we construe both Article III, § 35 requirements liberally to uphold validity, rather than construing them strictly to invalidate. *Robinson v. Hill,* 507 S.W.2d 521, 524 (Tex.1974); *Fletcher v. State,* 439 S.W.2d 656, 658 (Tex. 1969). This liberal rule of construction, however, has limits:

The rule of liberal construction will not be followed to the extent that it will relieve the legislature of the necessity of disclosing the real subject of the act in

Tex.Rev.Civ.Stat.Ann. art. 3928b (Vernon Supp.

the title thereof, nor will it be extended so as to hold the Acts valid, the titles of which are deceptive or misleading as to the real contents of the Act.

*Fletcher v. State,* 439 S.W.2d at 658, quoting from *Gulf Insurance Co. v. James,* 143 Tex. 424, 185 S.W.2d 966, 970 (1945); *see also Harris Co. Fresh Water Supply Dist. No. 55 v. Carr,* 372 S.W.2d 523, 525 (Tex. 1963).

The Omnibus Fee Bill's caption reads: An act relating to various fees collected by certain state and local agencies and to the imposition of new fees in connection with functions of certain state and local agencies.

### a. *The Unity of Subject Requirement.*

■ The purpose of the unity of subject requirement is to prevent log-rolling, i.e., the inclusion in a bill of several subjects having no connection with each other in order to create a combination of various interests in support of the whole bill. *Robinson v. Hill,* 507 S.W.2d 521, 524 (Tex. 1974). A bill satisfies the unity of subject requirement, even if it contains numerous provisions, however diverse, as long as these provisions relate directly or indirectly to the same general subject and have a mutual connection. *Id.* at 525; *Phillips v. Daniels,* 94 S.W.2d 1193, 1197 (Tex.Civ. App.—Austin 1936, writ ref'd). Both increasing filing fees and allocating a portion to general revenue relate to the bill's general subject—the imposition of new fees. The Omnibus Fee Bill does not violate the unity of subject requirement.

### b. *The Caption Requirement.*

The caption requirement's purpose "is to give notice of the title of the bill, not only to members of the legislature, but to the citizens at large, of the subject-matter of the projected law; and thereby to prevent the surreptitious passage of a law upon one subject under the guise of a title which expresses another." *Fletcher v. State,* 439 S.W.2d 656, 658 (Tex.1969), quoting *Adams*

1986).

*& Wickers v. San Angelo Water Works Co.*, 25 S.W. 605, 606 (1894). The test for whether a caption adequately expresses the bill's subject is:

> The title must not only express the subject, but must fairly express, and point to, that which is dealt with in the body of the Act. Its sufficiency is determined by what the title says and not by what it was intended to say.

*Harris Co. Fresh Water Supply Dist. No. 55 v. Carr*, 372 S.W.2d at 525.

■ The issue here is whether "state and local agencies" adequately expresses that the Omnibus Fee Bill alters fees for the judiciary, not whether the legislature intended the caption to encompass that particular subject. *Harris Co. Fresh Water Supply Dist. No. 55 v. Carr*, 372 S.W.2d at 524, citing *Adams & Wickers v. San Angelo Water Works Co.*, 25 S.W. at 606. The Attorney General argues that "state and local agencies" embraces the judiciary because each department of government—the legislative, the executive, and the judicial—. is literally an agent of the state. "Agencies" are commonly defined as administrative divisions of government. *Webster's New Collegiate Dictionary* (1980). While the executive branch administrates, the judiciary does not—we adjudicate. "Agencies" simply does not fairly inform the reader that the bill affects the judiciary, which is a separate branch of government. The bill's caption is invalid.

### c. *Sections Invalidated.*

When an act's caption does not adequately express its contents, Article III, § 35 states that "such Act shall be void only as to so much thereof, as shall not be so expressed." While "state and local agencies" does not express that judicial fees will be altered, it does indicate that executive branch fees will be affected. Only sections 31 and 32 are unconstitutional.

### III. *The Open Courts Provision.*

The Attorney General also contends that the $40 tax allocated to state general revenues does not violate the open courts provision of Article I, § 13. We disagree.

While state constitutions cannot subtract from the rights guaranteed by the United States Constitution, state constitutions can and often do provide additional rights for their citizens. *See, e.g., Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982); *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). The federal constitution sets the floor for individual rights; state constitutions establish the ceiling. Recently, state courts have not hesitated to look to their own constitutions to protect individual rights. *Symposium: The Emergence of State Constitutional Law*, 63 Texas L.Rev. 959 (1985); Linde, *First Things First: Rediscovering the States' Bill of Rights*, 9 U.Balt.L.Rev. 379 (1980); Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv. L.Rev. 489 (1977). This court has been in the mainstream of this movement. Comment, *Rediscovering State Constitutions for Individual Rights Protection*, 37 Baylor L.Rev. 463, 474–75 (1985) [hereinafter Comment, *Rediscovering State Constitutions*]. *See, e.g., Whitworth v. Bynum*, 699 S.W.2d 194 (Tex.1985) (Article I, § 3; equal protection clause); *Nelson v. Krusen*, 678 S.W.2d 918 (Tex.1984); *Haynes v. City of Abilene*, 659 S.W.2d 638 (Tex.1983) (Article I, § 17; taking private property for public use without just compensation); *Hajek v. Bill Mowbray Motors, Inc.*, 647 S.W.2d 253 (Tex.1983) (Article I, § 8; free speech).[3]

---

**3.** State constitutions originally were the primary guarantors of individual rights. Linde, *First Things First: Rediscovering the States' Bill of Rights*, 9 U.Balt.L.Rev. 379, 380–83 (1980); Comment, *Rediscovering State Constitutions* at 464 n. 7. Before the Civil War, state and local governments played a more active governing role than the federal government, yet at that time the Federal Bill of Rights did not apply to them. *Barron v. Mayor of Baltimore*, 32 U.S. (7 Pet.) 243, 8 L.Ed. 672, (1833); Nowak, Rotunda, and Young, *Constitutional Law* 412–13 (2nd ed. 1983). Only state judiciaries relying upon state constitutions protected individual rights from state governments before the Fourteenth Amendment's adoption in 1868 and its selective

Like the citizens of other states, Texans have adopted state constitutions to restrict governmental power and guarantee individual rights. The powers restricted and the individual rights guaranteed in the present constitution reflect Texas' values, customs, and traditions. Our constitution has independent vitality, and this court has the power and duty to protect the additional state guaranteed rights of all Texans. Article V, § 1; *Nelson v. Krusen,* 678 S.W.2d at 923. *See* Note, *Article I, § 21: Access to Courts in Florida,* 5 Fla.St.U.L.Rev. 871, 908–911. By enforcing our constitution, we provide Texans with their full individual rights and strengthen federalism. Brennan, *supra,* at 502–03.

The open courts provision, Article I, sec. 13 reads:

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted. All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

The provision's wording and history demonstrate the importance of the right of access to the courts. The provision's wording indicates the high value the drafters and ratifiers placed on the right of access to the courts. First, the language is mandatory: *"shall* be open" and *"shall* have remedy by due course of law." Further, it is all-inclusive: *"all* courts" are to be open; "for *every* person"; for *all* interests, "lands" (real property), "goods" (personal property), "person" (body and mind), and "reputation" (good name); *at all times,* since there is no emergency exception. This all-inclusive language contrasts with the qualifying language used in other sections. *See, e.g.,* Article I, § 9; Article I, § 11; Article I, § 11a.

The open courts provision's history also reflects its significance. It originates from

Chapter 40 of Magna Carta, the great charter of English liberties obtained from King John in 1215: "To none will we sell, to none deny or delay, right or justice." Tex. Const. art. I, sec. 13, interp. commentary (Vernon 1984); 14 Encyclopedia Britannica 576 (1967). Colonists brought to America and then to Texas their belief in the historic rights guaranteed by Magna Carta. 1 G. Braden, *The Constitution of the State of Texas: An Annotated and Comparative Analysis* 3 (1977); F. Stewart and J. Clark, *The Constitution and Government of Texas* 5 (1936). The right of access to the courts has been at the foundation of the American democratic experiment.

Every Texas Constitution has contained an open courts provision with the identical wording.[4] 1 G. Braden, *supra,* at 45; W. Harris, *Constitution of the State of Texas Annotated,* 114 (1913). Other Bill of Rights sections, in contrast, have been amended over the years. 1 G. Braden, *supra,* at 2.

As for the history of the 1875 Constitutional Convention, little is known about the delegates' views on the open courts provision. The convention convened on September 6, 1875 and its delegates established 21 committees, one of which was the Bill of Rights Committee. *Journal of the Constitutional Convention of the State of Texas, 1875* (1875) (hereinafter *Journal*); S.S. McKay, *Debates in the Texas Constitutional Convention of 1875* (1930). No journal was kept of the committee's meetings. S.S. McKay, *Seven Decades of the Texas Constitution of 1876* 77 (1942). After a month of deliberations, on October 2, 1875, the committee reported out a Bill of Rights draft with the present open courts provision. *Journal, supra,* at 270–73.

On October 12, the whole convention considered in order the Bill of Rights sections. *Id.* at 337. For that day and the next two, the delegates thoroughly discussed, vigor-

incorporation in this century. Linde, *supra,* at 382.

**4.** Texas has had six constitutions: The Republic Constitution of 1836, the Statehood Constitution of 1845, the Confederate Constitution of 1861,

the Union Constitution of 1866, the Reconstruction Constitution of 1869, and the present Post-Reconstruction Constitution of 1876. 1 G. Braden, *supra* at 2.

ously debated, and frequently amended the Bill of Rights sections. *Id.* at 337–39, 346–57. However, after discussing Section 12 at length, the delegates skipped over Section 13 (the open courts provision) and moved on to consider Section 14. *Id.* at 348. The Bill of Rights was further debated and amended on October 21, once again without mentioning or changing the open courts provision. *Id.* at 434–436. The entire Bill of Rights was then read and passed 66–9. *Id.* at 436. Apparently, the open courts provision was uncontroversial.

This court first enforced the open courts provision in 1852 in *O'Shea v. Twohig,* 9 Tex. 336, 341–42 (1852). The court followed with three other cases before the 1875 Constitutional Convention. *Teas v. Robinson,* 11 Tex. 774 (1854); *Clark v. Goss,* 12 Tex. 395 (1854); *Runge & Co. v. Wyatt,* 25 Tex.Supp. 291 (1860).[5] The people ratified the court's approach by passing an identical provision in the 1876 Constitution. This court then reaffirmed its commitment to the open courts provision in several cases shortly after the 1876 Constitution's adoption. *Lumpkin v. Muncey,* 66 Tex. 311, 17 S.W. 732 (1886); *Dillingham v. Putnam,* 109 Tex. 1, 14 S.W. 303 (1890); *Union Cent. Life Ins. Co. v. Chowning,* 86 Tex. 654, 26 S.W. 982 (1894); *Eustis v. City of Henrietta,* 90 Tex. 468, 39 S.W. 567 (1897).[6]

Besides the open courts provision, every Texas constitution has also included a separate due process provision, presently Article I, § 19;[7] 1 G. Braden, *supra,* at 67. Logically, our constitutions have included both provisions because they serve different purposes.[8] The open courts provision must have been intended to provide rights in addition to those in the due process provision or the former would be surplusage. Furthermore, the due process provision's general guarantees contrast with the open courts provision's specific guarantee

---

**5.** In *O'Shea v. Twohig,* a unanimous court indicated that its statutory interpretation, allowing a plaintiff to sue several defendants although the court designated for jurisdiction was not organized, was dictated by constitutional necessity. 9 Tex. at 341. Two years later in *Teas v. Robinson,* a unanimous court held that a defective statute could not deprive an individual of his "[right] to his appeal. This is guaranteed by the constitution and cannot be withheld." 11 Tex. at 777. In *Clark v. Goss,* a unanimous court reaffirmed *O'Shea v. Twohig.* 12 Tex. 395, 397–98 (1854).

In 1860 in *Runge & Co. v. Wyatt,* a unanimous court stated specifically that these prior cases were based upon the open courts provision. 25 Tex.Supp. 291 (1860). A statute required the plaintiff to sue in the county of the defendant's domicile; however, since there was no district clerk in the defendant's county, the plaintiff sued in the pre-partition county of domicile. Quoting the open courts provision, this court reversed a trial court judgment sustaining a plea to the jurisdiction. 25 Tex.Supp. at 294.

**6.** This court unanimously reaffirmed in another county organization case prior holdings that all citizens were entitled to the benefit of the courts. *Lumpkin v. Muncey,* 66 Tex. 311, 17 S.W. 732 (1886).

Four years later in the signal case of *Dillingham v. Putnam,* 109 Tex. 1, 14 S.W. 303 (1890), we unanimously held a statute unconstitutional under the open courts provision that required supersedeas bonds for receivers to be double the amount of judgment, interest, and costs. When petitioner put up a bond covering only costs, we overruled a motion to dismiss his appeal, holding that under the open courts provision "a party's right to appeal to this court cannot be made to depend on his ability to give a bond...." 14 S.W. at 304. In the same vein, in *Eustis v. City of Henrietta* we unanimously ruled unconstitutional a statute requiring defendants to pay their property taxes before being allowed to make a defense to a tax sale. 39 S.W. 567 (1897).

In *Union Cent. Life Ins. Co. v. Chowning,* this court upheld the constitutionality of a statute requiring insurance companies, after demand for payment was made and rejected, to pay a 12% penalty in addition to the claim and reasonable attorney's fees. 26 S.W. 982 (Tex.1894). It is significant that this court analyzed the state open courts provision and the federal constitutional arguments separately.

**7.** Art. I, sec. 19 reads: "No citizen of this state shall be deprived of life, liberty, property, privileges or immunities, or in any manner disenfranchised, except by the due course of law of the land." It is "the traditional due process guarantee." *Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex. 1983).

**8.** Thirty-seven states, plus Texas, have in addition to their traditional due process clauses open courts provisions to specifically guarantee the right of access to the courts. 1 G. Braden, *supra,* at 51, 73.

of a right of access to the courts. 1 G. Braden, *supra,* at 50.

Because of this history, we have held that the open courts provision is independent of other constitutional provisions. *Nelson v. Krusen,* 678 S.W.2d at 921; *Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex.1983). We have also held that Article I, § 13 and Article I, § 19 are different provisions providing separate guarantees. *Nelson v. Krusen,* 678 S.W.2d at 921. *See also* 1 G. Braden, *supra,* at 50.

■ The open courts provision specifically guarantees all litigants the right to redress their grievances—to use a popular and correct phrase, the right to their day in court. *Nelson v. Krusen,* 678 S.W.2d at 923; *Sax v. Votteler,* 648 S.W.2d at 665; *Hanks v. City of Port Arthur,* 121 Tex. 202, 48 S.W.2d 944, 947 (1932). This right is a substantial state constitutional right. *Nelson v. Krusen,* 678 S.W.2d at 921. Because a substantial right is involved, the legislature cannot arbitrarily or unreasonably interfere with a litigant's right of access to the courts. *Neagle v. Nelson,* 685 S.W.2d 11, 12 (Tex.1985); *Nelson v. Krusen,* 678 S.W.2d at 922; *Sax v. Votteler,* 648 S.W.2d at 664, 665; *Hanks v. City of Port Arthur,* 48 S.W.2d at 947, 948. Thus, the general open courts provision test balances the legislature's actual purpose in enacting a law against that law's interference with the individual's right of access to the courts. *Sax v. Votteler,* 648 S.W.2d at 665, 666. The government has the burden to show that the legislative purpose outweighs the interference with the individual's right of access. *Id.* at 666.

■ The question here is whether a filing fee that goes to state general revenues is an arbitrary and unreasonable interference with the right of access to the court. Section 32's purpose in allocating $40 of the $75 filing fee to the state general revenue fund is "to generate revenue and to

help finance state services." House Comm. on Appropriations, Bill Analysis, Tex.H.B. 1593, 69th Leg. (1985). The Comptroller estimates that the $40 fee will raise $11,062,000 this fiscal year, approximately ¹⁄₁₀ of 1% of state revenues. *Comptroller's Fiscal Note Estimate: H.B. 1593 by Rudd Conference Committee Version A–3* (May 29, 1985).

The major defect with the filing fee is that it is a general revenue tax on the right to litigate: the money goes to other statewide programs besides the judiciary.[9] Nearly all states with similar open courts provisions have held that filing fees that go to fund general welfare programs, and not court-related services, are unconstitutional. *Crocker v. Finley,* 99 Ill.2d 444, 77 Ill.Dec. 97, 459 N.E.2d 1346 (1984); *Farabee v. Board of Trustees, Lee County Law Library,* 254 So.2d 1 (FLa.1971). See also *Flood v. State,* 95 Fla. 1003, 117 So. 385 (1928); *Cook County v. Fairbank,* 78 N.E. 895 (Ill.1906); *Hayes v. C.C. & H. Min. & Mill Co.,* 126 S.W. 1051 (Mo.1910). *Cf. G.B.B. Investments, Inc. v. Hinterkopf,* 343 So.2d 899, 901 (Fla.Dist.Ct.App.—3rd 1977); *State v. Gorman,* 41 N.W. 948, 949 (Minn.1889).

Two recent cases, *Crocker v. Finley* and *Farabee v. Board of Trustees, Lee County Law Library,* are directly on point. In 1984 in *Crocker v. Finley,* the Illinois Supreme Court considered the constitutionality of a $5 fee in divorce suits to finance a statewide domestic violence shelter program. 77 Ill.Dec. 97, 459 N.E.2d 1346. The Illinois Supreme Court held that the $5 charge was a tax, and not a fee, because the charge had no relation to the judicial services rendered and was assessed to provide general revenue. 77 Ill.Dec. at 101–02, 459 N.E.2d at 1350–51. The specific program was laudable, but the court held the act violated its open courts provision:

9. The $11 million in general revenues raised from the fee flows out of the treasury at random. Since the judiciary accounts for only approximately ½ of 1% of state funding, 99.5% of the revenue generated from the fee must go

to other programs besides the judiciary. *See Texas Biennial Revenue Estimate 1986–1987, 69th Legislature,* Comptroller of Public Accounts (Jan.1985).

Court filing fees and taxes may be imposed only for purposes relating to the operation and maintenance of the courts ... Dissolution-of-marriage petitioners should not be required as a condition to filing, to support a general welfare program that relates neither to their litigation nor to the court system. If the right to obtain justice freely is to be a meaningful guarantee, it must preclude the legislature from raising general revenue through charges assessed to those who would utilize our courts. *Id.* 77 Ill.Dec. at 102, 459 N.E.2d at 1351.

The Florida Supreme Court in *Farabee v. Board of Trustees, Lee County Law Library* upheld $3 fees that went only for law libraries and legal aid societies. The Florida Supreme Court distinguished *Farabee* from *Flood v. State*, where it had held a $10 filing fee for both county law libraries and general county purposes violated its open courts provision. 117 So. at 386. The *Farabee* court explained that *Flood*'s fees, unlike *Farabee*'s, violated the open courts provision "[s]ince at least part of the fee was available to the county for the building of roads, schools, and so on[;] it could not be said that the fee levied was a cost of the administration of justice." *Farabee v. Board of Trustees, Lee County Law Library*, 254 So.2d at 5.[10]

The state argues that a tax on individual litigants is reasonable as long as the amount raised for general revenues is less than the amount spent from general revenues on the judiciary. This argument, however, uses the wrong perspective: a societal perspective. When individual rights guaranteed by the state constitution are involved, an individual rights perspective is used. From that perspective, litigants must pay a tax for general welfare programs as a condition to being allowed their right of access to the courts. This the open courts provision prohibits.

We hold that filing fees that go to state general revenues—in other words taxes on the right to litigate that pay for other programs besides the judiciary—are unreasonable impositions on the state constitutional right of access to the courts. Regardless of its size, such a filing fee is unconstitutional for filing fees cannot go for non-court-related purposes.

■ Filing fees and court costs are usually constitutional. Charging litigants that are able to pay a reasonable fee for judicial support services does not violate the open courts provision. *See Farabee v. Board of Trustees, Lee County Law Library*, 254 So.2d at 5; *State v. Young*, 238 So.2d 589, 590 (Fla.1970); *Crocker v. Finley*, 77 Ill.Dec. at 101-02, 459 N.E.2d at

---

**10.** The dissent's cases are off-point. *Marshall v. Holland*, 168 Ark. 449, 270 S.W. 609 (1925) asks whether the clerk must remit prepaid filing fees when the service's actual costs are less than the filing fee's approximated cost. The Arkansas court upheld prepayment because they did not want to impose an accounting nightmare on district clerks; the court said nothing about whether filing fees can constitutionally go to general public revenues. *Wright v. Atlantic Life Ins. Co.*, 112 W.Va. 420, 164 S.E. 500 (1931) contains the same question. In *Cook v. Municipal Ct. of Pine Bluff*, 287 Ark. 382, 699 S.W.2d 741 (1985), the Arkansas court did not specify what statutory provision was in question. The court quoted only this line from *Marshall*: " 'it is within the power of the Legislature to make reasonable provisions for the payments of *costs of litigation so as to help defray the expenses of the courts.*' " (emphasis added). 699 S.W.2d at 911. *State v. Judges*, 21 Ohio St. 1, 12 (Ohio 1871), does not involve an open courts challenge.

*In re Lee*, 64 Okl. 310, 168 P. 53 (1917), is a seventy-year old case from a jurisdiction that had just obtained statehood. The nascent court took a hostile view of its open courts provision, stating that it had never seen a case in which the open courts provision applied. *Id.* at 55. There was a vigorous dissent:

[I]rrespective of the injustice and denial of right that may follow, the portals of this court will open only when the clerk thereof is paid $40, $25 of which is disingenuously and incorrectly designated as a docket fee.... If it is within the power of the Legislature to impose a tax upon litigants, by requiring the prepayment of a charge of $25 in the guise of a docket fee, it would seem that the Legislature would be at liberty to multiply at will the amount of the so-called docket fee or tax and thus to permit an evil which the Constitution aimed to forestall." *Id.* at 58 (Sharp, C.J. dissenting).

1350–51; *Ali v. Danaher*, 47 Ill.2d 231, 265 N.E.2d 103, 106 (1970). Such fees interfere somewhat with access to the courts, but they are permitted because they go for court-related purposes.

In summary, we hold that the open courts provision invalidates the $40 filing fee increase for state general revenues and that the caption defect voids the entire $50 filing fee increase in sections 31 and 32 of H.B. 1593. We affirm the district court's judgment.

GONZALEZ, J., dissents.

GONZALEZ, Justice, dissenting.

I dissent. Section 31 of the Omnibus Fee Bill (House Bill 1593, 69th Leg., 1985) increased the district court filing fee from $25 to $75. Section 32 of that same bill allows the district clerk to retain $35 and requires the clerk to send the remainder to the comptroller for deposit in the general revenue fund. Sections 31 and 32 do not violate the Texas Constitution's open courts provision, Article I, § 13, nor do they violate the constitution's caption requirement, Article III, § 35.

### Open Courts Provision

In holding the act's sections unconstitutional, the court places great emphasis on the alleged violation of the open courts provision. The court states that this provision grants litigants a substantial right— "the right to their day in court"—and that the increased filing amounts to "a general revenue tax on the right to litigate." For these reasons, the court holds that Sections 31 and 32 violate our Texas Constitution's open courts provision.

The open courts provision is essentially a due process guarantee. *Sax v. Votteler*, 648 S.W.2d 661, 664 (Tex.1983). The requirements of procedural due process apply only to the threatened deprivation of liberty and property interests deserving the protection of the federal and state constitutions. *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972); *Tarrant County v. Ashmore*,

635 S.W.2d 417, 422 (Tex.1982). Therefore, any assessment of proper procedural safeguards necessarily begins with a consideration of whether the particular interest at stake is a protectable interest.

A constitutionally protected right must be a vested right or something more than a mere expectancy based upon an anticipated continuance of an existing law. *City of Dallas v. Trammel*, 129 Tex. 150, 101 S.W.2d 1009 (1937). Here, Hanlon clearly did not have a vested interest or right in a $25 district court filing fee. Hanlon argues, however, that he has a vested right to sue in the Texas courts. The critical issue is whether this right has been unreasonably restricted by the act. I submit that Hanlon's right to sue has not been unreasonably abridged. Hanlon could file suit this very day; all he has to do is pay the $75 filing fee or file as a pauper under Tex.R.Civ.P. 145. Thus, the Texas courts are "open" to litigants such as Hanlon. *No explanation is given by the court for how the act actually prevents litigants from exercising their right to bring suit.*

This court has frequently held that certain types of procedural requirements are not subject to open courts and other due process attacks. In *Clanton v. Clark*, 639 S.W.2d 929 (Tex.1982) the court held that a trial court's dismissal of a cause of action for failing to timely post a bond did not violate the dismissed party's due process rights under either the United States or Texas Constitutions. In *Federal Crude Oil Co. v. Yount-Lee Oil Co.*, 122 Tex. 21, 52 S.W.2d 56 (1932) this court held that when a corporation failed to pay its license or franchise taxes, the Legislature could "deny a corporation the right to sue or defend in our courts in any cause of action even though the same arose while the corporation was lawfully transacting its business within the state." *Id.* at 60. This denial of the corporation's right to sue does not violate the Texas open courts provision. We have noted that "no one has a vested interest in the rules, themselves, of the common law; and it is within the power of the Legislature to change them or entirely

repeal them." *Middleton v. Texas Power & Light Co.*, 108 Tex. 96, 185 S.W. 556, 559 (1916), *aff'd*, 249 U.S. 152, 39 S.Ct. 227, 63 L.Ed. 527 (1919).

Recently, we applied the open courts provision, holding that, as to the particular plaintiffs, specific medical malpractice statutes of limitations were unconstitutional. *See Neagle v. Nelson*, 685 S.W.2d 11 (Tex. 1985); *Nelson v. Krusen*, 678 S.W.2d 918 (Tex.1984); *Sax*, 648 S.W.2d 661. *Cf. Morrison v. Chan*, 699 S.W.2d 205 (Tex.1985). The common thread of this court's open courts decisions is that the Legislature cannot unreasonably abridge a person's right to bring a common-law cause of action by making a remedy by due course of law contingent on an impossible condition. *Morrison*, 699 S.W.2d at 207; *Neagle*, 685 S.W.2d at 12; *Nelson*, 678 S.W.2d at 921.

The increase in the filing fee cannot be characterized as an "impossible condition" as in the prior cases applying the open courts provision. A person's inability to pay the filing fee will not prevent them from filing a cause of action. Texas Rule of Civil Procedure 145 provides that persons who are unable to pay court costs can be excused from payment. Filing fees are a part of court costs. *See Rodeheaver v. Alridge*, 601 S.W.2d 51 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). Thus, Rule 145 assures that persons unable to pay the filing fee will have open access to the courts.

If, as the court implicitly holds, $75 effectively creates an "impossible condition" for some people, then surely the current $25 filing fee is also an "impossible" fee for other people. Regardless of the amount set, there will always be some who cannot afford to pay. In this sense, any fee could be characterized as "impossible"; it is precisely for this reason that Rule 145 exists. It is not that an act dealing with court fees could never violate a party's due process rights under the open courts provision, it is simply that under the facts of this case, no violation is shown.

In reviewing the act, the court does not apply traditional rules of construction. This court has observed that:

[i]n passing upon the constitutionality of a statute, we begin with a presumption of validity. It is to be presumed that the Legislature has not acted unreasonably or arbitrarily; and a mere-difference of opinion, where reasonable minds could differ, is not a sufficient basis for striking down legislation as arbitrary or unreasonable.

*Smith v. Davis*, 426 S.W.2d 827, 831 (Tex. 1968). *See also Sax v. Votteler*, 648 S.W.2d 661, 664 (Tex.1983). The burden of demonstrating constitutional invalidity rests on the party assailing the statute. *Robinson v. Hill*, 507 S.W.2d 521, 524 (Tex. 1974); *Smith v. Craddick*, 471 S.W.2d 375, 378 (Tex.1971).

The court erroneously reverses the burden in this case, stating that because a "substantial right" is involved that "[t]he government has the burden to show that the legislative purpose outweighs the interference with the individual's right of access." However, the court ignores the fact that Hanlon must first establish a substantial right and then show that the statute violates this right. It is not until this point that the government has to offer evidence into the balancing of interests between the legislative purpose and the individual's rights. Thus, the burden is on the litigant to show that the act is unconstitutional. I do not believe that Hanlon has shown that the act has prevented him from exercising his right to sue in our courts or that this right has been unreasonably curtailed.

Other states have upheld similar filing fee acts against attacks for violation of the respective state's open courts provision. In *Marshall v. Holland*, 168 Ark. 449, 270 S.W. 609 (1925) the Arkansas Supreme Court confronted the question of whether the requirement of advanced fees for litigants violated the Arkansas Bill of Rights (Const. art. 2, § 13) which provides that "every person is entitled to 'obtain justice freely, and without purchase.'" In holding that the act requiring payment of the ad-

vanced fee did not violate this constitutional provision, the Arkansas Supreme Court stated:

> It is the contention that the requirement for the payment of these fees without a provision for a pro rata return of the fees not used in paying the salaries renders the provision oppressive and therefore unconstitutional. *It cannot be said, we think, that the amount is excessive, and the fact that the unused amount of the fees goes into the public revenues does not render the statute void. It is within the power of the Legislature to make reasonable provisions for the payment of costs of litigation so as to help defray the expenses of the courts. Our conclusion is that this provision of the statute is not invalid.*

*Id.* at 613 (emphasis added). The Arkansas Supreme Court. recently reaffirmed the *Marshall* analysis in *Cook v. Municipal Ct. of Pine Bluff,* 287 Ark. 382, 699 S.W.2d 741 (1985).

In 1917, in *In re Lee,* 64 Okl. 310, 168 P. 53 (1917) the Oklahoma Supreme Court addressed an open courts attack against a statute which raised the cost of filing in that court. The petitioner argued that a $25 increase in the filing fee was unreasonable because the only service rendered was the "placing of a rubber stamp upon a case-made, and the writing upon the index and docketing records and filing of such case" by the clerk. The clerk retained the original $15 portion of the $40 filing fee. The $25 increase in the filing fee went into the state treasury. In upholding the validity of the statute, the *Lee* court observed that "the purpose of the fee is to reimburse the state for the expenses incurred in providing and maintaining all of the officers and other facilities of the court, and is intended as compensation to the state for services rendered, not by the clerk only, but by the entire court." *Id.* at 56. Thus, the Oklahoma Supreme Court allowed the $25 increase to go into the states treasury, since it compensated the state for maintaining the court system.

A critical factor in the *Lee* court's decision to uphold the validity of the statute was that the fee increase was reasonable. This should be a primary inquiry—was the fee increase reasonable? An Ohio court states that it does not matter "whether the amount to be paid therefor [court fee] goes to the officer, or into the public treasury, provided no more is exacted than is just and reasonable for the facilities afforded, and the services performed." *Lee,* 168 P. at 56 (quoting *State v. Judges,* 21 Ohio St. 12 (1871)). *See also McHenry v. Humes,* 112 W.Va. 432, 164 S.E. 501 (1932). I submit that, due to the increased costs in maintaining and operating our state court system since the fee was in 1977, set an increase in the district court filing fee from $25 to $75 is reasonable.

The court draws a significant distinction on the fact that the fee goes into state general revenues and not into a special fund for the courts. The court holds that "filing fees that go to state general revenues—in other words, taxes on the right to litigate that pay for other programs besides the judiciary—are unreasonable impositions on the state constitutional right of access to the courts." The court thus implies that if the $50 increase went into a special fund for the benefit of the courts, the act would be constitutional. As the state observes, however, a special fund is no more than an accounting device. Since dollars are fungible and more money will be spent on the court system than will be taken in under Section 32, it is absurd to conclude money collected from fees "will pay for other programs besides the judiciary." The state's annual share of the filing fee is expected to be approximately $11,000,000 while the State's annual cost will be over $52,000,000. *See* Art. of May 27, 1985, ch. 980, art. IV, 1985 Tex. Sess.Law Serv. 7284 (Vernon). As long as the State pays more in financing the judiciary than the courts receive in user fees, the court's logic is flawed. This court need not presume that any portion of the fee increase goes to support general welfare programs unrelated to the court system.

If any presumption is to be made, it should be in favor of the validity of the statute.

The court relies on Florida and Illinois cases as support for its position that Sections 31 and 32 are unconstitutional. *Crocker v. Finley*, 99 Ill.2d 444, 459 N.E.2d 1346, 77 Ill.D. 97 (1984); *Flood v. State*, 95 Fla. 1003, 117 So. 385 (Fla.1925); *Farabee v. Bd. of Trustees, Lee Cty. Law Library*, 254 So.2d 1, 5 (Fla.1971). Neither *Crocker* nor *Flood* involved an ordinary filing fee, or portion of a filing fee, deposited in the state general revenue fund. *Crocker* involved a special $5.00 filing fee which was to be collected from petitioners for dissolution of marriage in addition to the regular filing fee. The proceeds of this special fee were earmarked for the Domestic Violence and Shelter and Service Fund. The *Crocker* court held this fee conflicted with the Illinois constitutional right to obtain justice freely, not because it was a tax on litigation, but because it was a tax to support a general welfare program which was insufficiently related to the parties' litigation or the court system. Since *Crocker* involved a special fee set aside for a special purpose fund, it was absolutely clear that the proceeds of the fee would not in any way go to defray the costs of the court system.

In *Flood*, a 1928 statute imposed a $10 docket fee on litigants in certain counties to be used to establish a county law library with any excess to be used for "general county purposes" as the board of county commissioners deemed best. The *Flood* court evidently felt that a tax levied to support a law library was unconstitutional under Florida's open court provision. Subsequently, the *Farabee* court "receded" from *Flood* to the extent that it could be read to prohibit such library fees as a cost unnecessary to the administration of justice. *Farabee* deemed the crucial fact in *Flood* to be that any excess fees were available to the county for building roads, etc., purposes unrelated to the administration of justice. Thus, the Florida courts adjust their interpretation according to the particular facts of the case. *See State v. Young*, 238 So.2d 589 (Fla.1970) (where an assessment going into state treasury may still be considered acceptable court cost).

Even assuming the court's treatment of the Florida and Illinois cases is correct, the fact that this may be the "rule in other jurisdictions or be the expression of commentators does not necessarily mean it will be the rule of law in Texas." *Hofer v. Lavender*, 679 S.W.2d 470, 473 (Tex.1984).

## Caption Requirement

The court holds that Sections 31 and 32 are unconstitutional because they violate the caption requirement under Article III, § 35. The purpose of a title or caption is to give a general statement of, and call attention to, the subject matter of an act, so that legislators and the public at large may be apprised of the subject of the legislation. *Smith v. Davis*, 426 S.W.2d 827, 833 (Tex.1968). The key reason for the caption requirement is to prevent surprise, deception, or the proverbial "log-rolling" of legislation.

The Omnibus Fee Bill's caption reads:

An act relating to various fees collected by certain state and local agencies and to the imposition of new fees in connection with the functions of certain state and local agencies.

The caption informs the reader that new fees are going to be imposed on state agencies. There is no limiting language; the reader is to put on notice that there may be an across the board increase in the fees paid to all state agencies. The caption adequately informs legislators that the act could include an increase in the filing fee paid to district court clerks.

In reviewing the caption, the court ignores the rule of construction that "[b]oth the constitutional provision [caption requirement] and the questioned statute are to be liberally construed in favor of constitutionality." *Robinson*, 507 S.W.2d at 524. The court states that the term "state and local agencies" in the caption "simply does not fairly inform the reader that the bill

affects the judiciary."[1] However, this view does not conform to reality. Generally, legislators perceive and treat the judiciary as a state agency. One need look no further than state budget hearings, where the judiciary is consistently treated as "agency" of the state. The court's strict construction of the term "state and local agencies" is unwarranted.

The purposes of the caption requirement have been fulfilled in this case. Both the Legislature and the public were adequately apprised of the subject of the legislation. Thus, the court errs in holding that the caption to the fee statute fails to comply with the constitution's caption requirement.

### Conclusion

The court's decision in this case may bring other fee statutes under constitutional attack. For instance, Tex.Gov't. Code Ann. § 51.005, which sets out the fees applicable to this court, directs the clerk to deposit those fees and costs into the state treasury. These monies end up in the general revenue fund; thereby making our own filing fee subject to a similar attack. *See also* Tex.Gov't.Code Ann. § 51.207(d) and (e).

For the above reasons, I dissent.[2]

---

1. The issue is not whether the judiciary "administers" or "adjudicates." The "judiciary" does not collect the fee. The fee is collected by the district court clerk, a ministerial officer of the court. Furthermore, I believe that the public at large views district clerks as agents of the state.

2. What happens to the money that has already been collected by the district court clerks?